# UNITED STATES DISTRICT COURT
## District of Kansas

UNITED STATES OF AMERICA,

        Plaintiff,

        v.                        CASE NO. 24-CR-20021

CHLOE WADE GULLOTTO

        Defendant.

## GOVERNMENT'S SENTENCING MEMORANDUM

**COMES NOW**, the United States of America, by and through Assistant United States Attorney Audrey McCormick, and requests the Court accept the Rule 11(c)(1)(c) agreement jointly proposed by the parties. Further, the United States requests that the Court impose a term of supervised release of 20 years and provide restitution and assessments as outlined below. In support of its requests, the United States provides the following for the Court's consideration:

    **I.**    **SENTENCING DETERMINATIONS**

This Court has several issues to determine at sentencing, which include the following:

1. Has defendant's legal name been determined?
2. Will the Court accept the Rule 11(c)(1)(c) agreement proposed by the parties?
3. What term of supervised release should be imposed?
4. How much restitution to order for S.G. and any series victim?
5. Should a Child Pornography Assessment be ordered and, if so, how much?

II.     **DEFENDANT'S LEGAL NAME: CHLOE WADE GULLOTTO**

Per the Court's request, the government obtained a certified copy of the order legally changing defendant's name from Dalton Wade Howard to Chloe Wade Gullotto. The order was issued on July 2, 2018, in Leavenworth County, KS District Court case number 2019-CV-000120. A copy of the order was provided to defense and probation on October 24, 2024. Undersigned counsel will have the certified copy available for the Court's review at the sentencing hearing.

III.    **RULE 11(c)(1)(c) AGREEMENT IS PRESUMPTIVELY REASONABLE**

On October 17, 2024, the parties presented this Court with the proposed Rule 11(c)(1)(c) agreement that had been reached between the parties after much negotiation and thoughtful consideration regarding all of the surrounding circumstances involving the defendant and the charged victim. The agreement proposes 360 months in prison on Count 1 and 60 months in prison on Count 2, to run concurrently, for a total of 360 months, or 30 years, in prison.

Pursuant to the Presentence Investigation Report, "based upon a total offense level of 41 and a criminal history category of I, the guideline imprisonment range is 324 months to 405 months." (Doc. 35, ¶ 79.) Neither party has lodged objections to the PSR calculations. *Id*. at ¶ 131-132. Therefore, the proposed Rule 11(c)(1)(c) sentence is within the properly calculated guidelines range and presumptively reasonable. *United States v. Blair*, 933 F.3d 1271, 1274 (10th Cir. 2019).

Furthermore, while not binding on this Court or the parties in this matter, the associated state case, which charged defendant with perpetrating hands-on offenses against the charged victim and carried the possibility of significant, consecutive imprisonment, was dismissed without prejudice after defendant's change of plea in the present matter. The state has indicated that it

would consider re-filing its case if the proposed Rule 11(c)(1)(c) agreement is not accepted by this Court.

## IV.  SUPERVISED RELEASE

Should the Court accept the Rule 11(c)(1)(c) agreement, the range of supervised release to be considered by the Court is 10-20 years. Otherwise, the range is not less than 5 years, or life. 18 U.S.C. §3583(k). The government is requesting a term of 20 years under the Rule 11(c)(1)(c) agreement, if accepted, or otherwise, life-time supervised release.

Pursuant to the United States Sentencing Commission Guidelines (U.S.S.G.) § 5D1.2(c) policy statement, "the statutory maximum term of supervised release is recommended" for any sex offenses. "The court should ensure that the term imposed on the defendant is long enough to address the purposes of imposing supervised release on the defendant" U.S.S.G. §5D1.2 n. 4. The factors to be considered when determining the length of the term of supervised release are the same the Court is to consider when determining what term of imprisonment to impose. U.S.S.G. §5D1.1 n. 3, 18 U.S.C. § 3583(c).

Defendant has a documented history of hands-on sexual perpetration against children that extends back to defendant's youth. As outlined in the PSR, a juvenile case was filed against defendant in 2014 for 2 counts of Aggravated Indecent Liberty, <14 after two cousins, age 3 and 6, made disclosures of sexual abuse. (Doc. 35, ¶ 57.) Defendant engaged in a diversion program that involved treatment geared toward sex offenders. Defendant successfully completed diversion in 2017, despite two additional minors making additional allegations of sexual abuse at the hands of the defendant during the diversionary period. At the time, defendant denied such allegations. However, when being interviewed in the present case by law enforcement, defendant admitted to sexual contact with a total of 4 minors, some of whom never reported the

abuse. Defendant further disclosed repeated sexual abuse of the victims subject to defendant's diversion case. According to the defendant, all victims were between the ages of 5 and 12, while defendant was around 14 years old (PSR notes the youngest was 3, ¶ 57).

During the interviews with law enforcement, defendant further acknowledged an obsession and addiction to child pornography, particularly to child pornography involving infants and toddlers, that has persisted since defendant's youth. This obsession was illustrated in the 9 CyberTips reported to the National Center for Missing and Exploited Children (NCMEC) over the course of a month and a half, all stemming from defendant's cell phone cloud provider – Synchronoss (with Verizon) – which gave rise to the present investigation. The CyberTips each contained separate and distinct files, many of which show infants being vaginally or anally penetrated with penises or other sexual objects while the child is crying or screaming.

As part of defendant's change of plea, defendant, now age 24, admitted to taking photos of the charged victim's anus and genitalia to elicit a sexual response in the defendant. Additionally, defendant admitted during an interview with law enforcement that defendant masturbated to the thought of having access to a child prior to the victim's birth. Finally, defendant and defendant's spouse both acknowledged to law enforcement that defendant slept alone and naked in a bed with the victim and defendant was the primary caretaker for the child, being alone with the child for extended periods of time. When the FBI executed the search warrant on the home around 6:00 am, defendant was found naked holding the victim, who was approximately 18 months at the time. As detailed by the Victim Impact Statement provided for the charged victim, current caretakers and professionals have observed the victim's trauma response during diaper changes, bath time, and at night.

Extended terms of supervised release are appropriate in sex cases, particularly when there is a history of hands-on offending, due to general lack of reporting of sex crimes, difficulty in measuring recidivism for sexual offenders, and threat of harm to the public. These concerns undoubtedly fueled much of the legislative developments in the 2000s that resulted in the current ranges of punishment and supervised release that are in effect today.

In 2001, the United States Sentencing Guideline §5D1.2(c) was first amended to include the recommendation that "if the instant offense of conviction is a sex offense, the statutory maximum term of supervised release is recommended." The amendment came in response to the Protection of Children from Sexual Predators Act of 1998, Pub. L. 105-314, and to "effectuate the Commission's intent that offenders who commit sex crimes receive appropriate treatment and monitoring." U.S.S.G. §5D1.2(c) Editor's Note. (*See, United States v. Young*, 502 Fed. Appx. 726, 729 (10th Cir. 2012) (lifetime supervised release for possession of child pornography conviction was reasonable. The court summarized several sister circuit's similar findings which held the lifetime supervision policy statement of U.S.S.G. §5D1.2(b)(2) "reflects the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public" and "because such criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison."))

Next came the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (PROTECT ACT), PL-108-21, 117 Stat. 650. The PROTECT ACT raised the *ceiling* on supervised release for sex offenses from five years to life and, among other items, removed any statute of limitations for crimes involving the physical or sexual abuse of a child. Subsection (k) appears for the first time in 18 U.S.C. 3583, effective April 30, 2003, and states

5

that the authorized term of supervised release for any offense involving a minor, including possession of child pornography, is "any term of years or life." The Adam Walsh Child Protection and Safety Act of 2006 further highlighted the need for increased monitoring and treatment of sex offenders through supervised release. Pub. L. 109-248. Section 141 of the Adam Walsh Act amended 18 U.S.C. 3583(k), effective July 27, 2006, and raised the *floor* on supervised release for sex offenders, "any term of years not less than 5, or life."

The U.S. Sentencing Commission's 2021 report on <u>non-production</u> sex offenders further acknowledges the flaws in recidivism research for sex offenders and provides a warning that the "dark figure" of crime "looms large in sexual offenses against children, which often go unreported or undetected…accordingly, any research on sex offender recidivism based on reported arrests, including the Commission's recidivism findings, should be viewed as a conservative measurement of actual recidivism[1]." U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography: Non-Production Offenses*, 63 (2021).

As summarized by a recent research brief authored by Roger Przybylski and published by the Department of Justice, in conjunction with the National Criminal Justice Association on Recidivism of Adult Sexual Offenders:

> The recidivism of sex offenders is difficult to measure. The surreptitious nature of sex crimes, the fact that few sexual offenses are reported to authorities, and the variation in the ways researchers calculate recidivism rates all contribute to the problem.
>
> Research has clearly shown that many sex offenses are never reported to authorities…in addition, only a subset of sex offenses that are reported to law

---

[1] Commission cited to the following in support of its assertion that sexual crimes are underreported: William G. Skogan, *Dimensions of the Dark Figure of Unreported Crime*, 23 Crime & Delinquency 41, 50 (1977); Nicholas Scurich & Richard S. John, *The Dark Figure of Sexual Recidivism*, 37 Behav. Sci. & The Law 158 (2019); Ryan C.W. Hall & Richard C.W. Hall, *A profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, 82 Mayo Clinic Prosc. 457, 460-61 (2007)(noting that studies show that only an "estimated 1 in 20 cases of child sexual abuse is reported or identified" and that "an arrest was made in only 29% of reported juvenile sexual assaults.")

> enforcement result in the arrest of the perpetrator.  Given these dynamics, there is widespread recognition that the officially recorded recidivism rates of sexual offenders are a diluted measure of reoffending.[2]

Roger Przybylski, *Recidivism of Adult Sexual Offenders*, 1 (2015).

These legislative developments, based on research in the field, speak to the well-known difficulties in protecting the public from sex offenders by increasing the amount of time to discover and prosecute said crimes and increasing the amount of time in which sex offenders can be closely monitored, treated, and reintegrated.  The common denominator in all the legislative and research developments in the field since the turn of the century is: *time*.

As it relates to the present case, defendant already has a documented history of reoccurring recidivism of hands-on sexual offending against children, some of which was never reported by the child.  Significantly, the programing established during defendant's juvenile case diversionary period was specifically geared toward modifying defendant's thinking patterns with the hope of preventing further offending.  Seven years after defendant was successfully discharged from diversion, defendant was still offending.

While defendant is facing a significant amount of prison time (if the Court accepts the Rule 11(c)(1)(c) agreement, at least 25 years if credit for time served and good time credit are added in), the purpose of supervised release fulfills rehabilitative purposes that are separate and distinct from those served by incarceration.  *United States v. Johnson*, 120 S.Ct. 1114, 1118-19 (2000) ("The primary goal of supervised release is to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense…").  While defendant may be around 50 years old upon release, defendant's documented criminal conduct "reflect[s] deep-seated aberrant sexual disorders that are not likely to disappear within a few years of

---

[2] Roger Przybylski, Recidivism of Adult Sexual Offenders, 1 (2015); article can be retrieved https://smart.ojp.gov/somapi/chapter-5-adult-sex-offender-recidivism

release from prison." *Young*, 502 Fed. Appx. 726, 729 (10th Cir. 2012).  For all the aforementioned reasons, the government respectfully requests the Court order a term of supervised release of 20 years, if the Rule 11(c)(1)(c) agreement is accepted, otherwise, life.

V.      **RESTITUTION**

The only victim that has requested restitution as of the filing of this pleading is the charged victim, S.G.  All 14 series victims were sent a notification of the sentencing hearing on December 18, 2024.  While series victim Jan_Socks1 initially submitted a restitution request and a Victim Impact Statement to the government, after discovering there was a hands-on victim, has since withdrawn their restitution request.

S.G. remains in the legal custody of the State of Kansas, having been removed from the biological parents' custody upon the arrest of the defendant.  S.G. is currently placed in foster care.  S.G., now 2.5 years old, attends weekly counseling sessions to address the issues outlined in the Victim Impact Statement included in the PSR.  (Doc. 35, ¶ 19.)  Each of those sessions costs $150.  The projected cost for S.G. to continue counseling at various intervals is as follows:

| Cost per Session - Occurrence | Length of Time | Cost |
|---|---|---|
| $150/session (Weekly) | 1 Year | $7,800.00 |
| $150/session (Weekly) | 5 Years | $39,000.00 |
| $150/session (Weekly) | 10 Years | $78,000.00 |
| $150/session (Weekly) | 15 Years | $117,000.00 |
| $150/session (Weekly) | 20 Years | $156,000.00 |

While S.G. is still young, the lifelong impact defendant's sexual abuse and exploitation may have on S.G. cannot be understated.  The United States Sentencing Commission's 2012 "Report to Congress: Federal Child Pornography Offenses"[3] noted the manner of harm caused to victims of offenses like those in this case:

---

[3] The Report is available online at https://www.ussc.gov/research/congressional-reports/2012-report-congress-

Child pornography victims face other types of victimization that that are separate from the harm of production. Even after the physical abuse has ended, child pornography victims suffer due to continued circulation of their images or the ongoing potential for circulation of their images. Both Congress and the Supreme Court have concluded that the ongoing distribution of child pornography images violates the victim's privacy and exacerbates the continued harms to the victim. Congress has spoken about ongoing circulation, noting that "its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years." The Supreme Court likewise has described child pornography images as "a permanent record" and explained that "the harm to the child is exacerbated by their circulation." It further noted that this is a harm distinct from that caused during the production of the images: it is "the pornography's continued existence caus[ing] the child victims continuing harm by haunting the children in years to come."

Unlike child sex abuse victims whose abuse has not been recorded, child pornography victims "grow up knowing that there are images of [themselves] being sexually abused which are available in perpetuity." For this reason, child pornography victims are subject to a greater long-term risk of depression, guilt, poor self-esteem, feelings of inferiority, interpersonal problems, delinquency, substance abuse, suicidal thoughts, and post-traumatic stress disorder than other child sexual assault victims. As one victim stated, "[u]nlike other forms of exploitations, this one is never ending. Everyday people are trading and sharing videos of me as a little girl being raped in the most sadistic ways."

Victims have reported suffering from the knowledge that the images of their graphic abuse are being utilized for sexual gratification. They also state that they fear that the images are being used to groom new victims for sexual abuse. One victim explained, "I am horrified by the thought that other children will probably be abused because of my pictures. Will someone show my pictures to other kids . . . then tell them what to do? Will they see me and think it's okay for them to do the same thing?"

Victims suffer from not knowing who has seen their images. Victims "report remaining always vigilant and fearful that any interaction with a computer might lead to exposure of the images of the sexual abuse that they have endured." Victims fear that strangers they see on the street have seen images of their abuse, and they are ashamed and embarrassed that a teacher, a potential date, or a stranger in public will recognize them. One victim explained that "[e]very day of my life I live in constant fear that someone will see my pictures and recognize me and that I will be humiliated all over again. It hurts me to know someone is looking at them

federal-child-pornography-offenses (last accessed Aug. 6, 2024).

— at me — when I was just a little girl being abused for the camera."

2012 Report, Chapter 5, pp. 112-13 (footnotes omitted).

Given the likelihood that the physical, emotional, and psychological effects stemming from defendant's offenses against S.G. will follow them through their childhood and potentially their entire life, the government is requesting 20 years' worth of weekly counseling sessions, or $156,000 in restitution for S.G.

## VI.   CHILD PORNOGRAPHY ASSESSMENT

This assessment is also known as the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 or "AVAA.[4]" Pursuant to 18 U.S.C. §2259A, "in addition to any other criminal penalty, restitution, or special assessment authorized by law, the court shall assess…not more than $50,000 on any person convicted of a child pornography production offense…In determining the amount of the assessment…the court shall consider the factors set forth in subsections 3553(a) and 3572." Further imposing this assessment "does not relieve a defendant of, or entitle a defendant to reduce the amount of any other penalty by the amount of the assessment."

In *United States v. Gentry*, the Tenth Circuit reviewed an AVAA assessment as it relates to the above stated factors:

> Section 3553(a) sets forth the factors a court should consider in imposing a sentence. These factors are (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the applicable guidelines; (5) any pertinent Sentencing Commission policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

---

[4] Effective December 7, 2018, Pub. L. No. 115-299, 132 Stat. 4383.

10

Section 3572 sets forth the factors a district court should consider in determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine. Together with the factors set forth in §3553(a) the court must consider: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose on the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose; (3) any pecuniary loss inflicted upon others as a result of the offense; (4) whether restitution is ordered or made and the mount of such restitution; (5) the need to deprive the defendant of illegally obtained gains from the offense; (6) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence; (7) whether the defendant can pass on to consumers or other persons the expense of the fine; and (8) whether the defendant is an organization.

2024 WL 177693 (January 17, 2024) (holding that while the District Court need not specify every single factor for the record, the record must show that these factors were considered by the Court prior to issuing the assessment.)

While the government is seeking a restitution order for the charged victim in this case, an AVAA assessment shall still be assessed against the defendant, as they serve different purposes under different legal authority:

After the enactment of the AVAA, there are several distinct, independent financial consequences that may be imposed, and in some cases must be imposed, on individuals convicted of child pornography offenses. See 18 U.S.C. §§ 3013, 3014, 2259, and 2259A…Restitution may be imposed if the Government offers adequate proof of causation and losses incurred by any identified victim, but a special assessment is imposed in the same manner as a fine and does not require the identification of any individual victim. Special assessments paid pursuant to Section 2259A do not go to a specific victim, but rather are deposited and pooled in the 'Child Pornography Victims Reserve' established in 18 U.S.C. §2259B. Restitution under 18 U.S.C. §2259 requires identification of a victim and proof of losses, but a special assessment under 18 U.S.C. § 2259A does not. The district court did not err in assessing a monetary penalty under the AVAA. Because a monetary penalty under the AVAA is separate and distinct from restitution, and a special assessment under 18 U.S.C. § 2259A does not require identification of a victim and proof of losses, the district court did not err in assessing a monetary penalty under the AVAA.

*United States v. Madrid*, 978 F.3d 201, 206 (5th Cir. 2020).

The AVAA established the Child Pornography Victims Reserve or the Defined Monetary Assistance Victims Reserve/DMA Victims Reserve, which is part of the Federal Crime Victims Fund, administered by the Office for Victims of Crime (OVC).[5] A child pornography victim who does not initially request or receive restitution may be entitled to receive a one-time payment from this fund. As of the filing of this pleading, none of the 14 identified series victims have requested restitution. Victims may not initially request restitution for a variety of reasons to include wanting to give a hands-on victims restitution priority or that receiving the restitution is a painful reminder of the crimes that have continuously been perpetuated against them. The AVAA fund provides them future safety net of funds, should they need them. It is therefore appropriate for the Court to order an AVAA assessment in the present case, after appropriately assessing the above referenced factors, in an amount not to exceed $50,000. The government asserts that, based on the above referenced factors, a $10,000 AVAA assessment is appropriate. Pursuant to 18 U.S.C. §2259A(d)(2), restitution for S.G. would be paid in full prior to any money being disbursed to the AVAA.

VII.    CONCLUSION

For all the aforementioned reasons, the government requests the Court accept the Rule 11(c)(1)(c) agreement, impose a total sentence of 360 months, impose a term of supervised release of 20 years, order restitution for S.G. in the amount of $156,000, order an AVAA/Child Pornography Assessment in the amount of $10,000, order a mandatory special assessment of $100 per count, and any other relief that the Court deems just under the circumstances.

---

[5] For more detail, please see
https://www.justice.gov/dmavr#:~:text=About%20the%20DMA%20Victims%20Reserve,-The%20DMA%20Victims&text=The%20DMA%20Victims%20Reserve%20is%20funded%20by%20assessments%20and%20penalties,of%20%2435%2C000%20from%20this%20fund.

Respectfully Submitted,

DUSTON J. SLINKARD
Acting United States Attorney
District of Kansas


*s/Audrey McCormick*
AUDREY MCCORMICK, D.Kan. #24847
Assistant United States Attorney
500 State Ave., Suite 360
Kansas City, KS 6617
Tele: (913) 551-6730
Fax: (913) 551-6541
e-mail: Audrey.McCormick@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on February 11, 2025, I electronically filed this motion with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all attorneys of record.

/s/Audrey McCormick
Audrey McCormick
Assistant United States Attorney